**TRANSPHASE SYSTEMS, INC., Plaintiff,**

v.

**SOUTHERN CALIFORNIA EDISON COMPANY and San Diego Gas and Electric Company, Defendants.**

**No. CV 93–2552 KN (Ex).**

United States District Court, C.D. California.

Oct. 7, 1993.

Walter D. Ames, Washington, DC, David Brand, Transphase Systems, Inc., Huntington Beach, CA, for plaintiff.

Phillip A. Davis, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, James R. Atwood, Steven J. Rosenbaum, John D. Kirby, Covington & Burling, Washington, DC, for defendant San Diego Gas & Elec. Co.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

KENYON, District Judge.

This case comes before the Court on defendants Southern California Edison Company's ("SCE") and San Diego Gas and Electric Company's ("SDG & E") Motions to Dismiss Transphase System Inc's federal antitrust claims for failure to state a cause of action pursuant to Federal Rule 12(b)(6). Defendants allege, among other things, that Transphase's antitrust claims are barred by the "state action" doctrine and that SCE and SDG & E's participation in proceedings before the California Public Utilities Commission ("CPUC") is protected conduct under the Noerr–Pennington Doctrine. Defendant SDG & E also asserts that Transphase has failed to allege a claim under the antitrust laws because it has failed to adequately allege that the defendants were significant competitors in the relevant product market and that their conduct created a dangerous probability that they would monopolize that market.[1] The Court agrees with all of these contentions and therefore GRANTS SCE's and SDG & E's Motions to Dismiss Transphase's antitrust claims with prejudice. The Court also dismisses Transphase's pendent state law claims under the California Unfair Practices Act and the California Cartwright Act. The Court explains its reasoning briefly in the Discussion section below.

## I. INTRODUCTION

Plaintiff Transphase Systems, Inc. ("Transphase") sells thermal energy storage ("TES") systems designed to shift electricity use from high demand periods (such as hot summer days) when electricity is more expensive to provide to lower demand times, typically at night. Transphase's particular TES system uses cooling tanks containing salt water that is frozen at night. Water is cooled as the tanks defrost during the day and is then circulated through a building's air conditioning system to provide cool air. Transphase's TES system is one of a variety of technologies in "demand-side management" ("DSM") which are designed to promote energy conservation and reduce the need for new power generation by shifting electricity use from high to low demand periods. DSM resources like Transphase's TES system are supposed to benefit ratepayers by offsetting the need for utilities to build power plants or buy additional electric capacity from independent power producers at a higher unit cost than the ratepayers would need to pay for the DSM system.

Commercial electricity customers can reduce their electric bills by using Transphase's product to take advantage of lower nighttime off peak electricity rates. The drawback is that Transphase's TES technology is too expensive to make it commercially attractive; the typical commercial electric customer would find the "payback period" needed to recoup his initial capital investment to be too long to justify the initial expense of buying one of Transphase's systems. In order to remedy this problem and promote the use of energy conserving/load management technologies, the CPUC authorizes utility companies like SCE and SDG & E to provide rebates for electricity customers

---

1. Defendants' motions present several other arguments in favor of dismissing Transphase's complaint, including that Transphase has failed to allege any anticompetitive conduct or antitrust injury suffered by Transphase. Although these arguments are closely related to SDG & E's argument concerning the relevant product market, the Court does not directly address them.

who utilize DSM technology. Both SCE[2] and SDG & E[3] provide such rebates for customers who decide to utilize DSM .systems like that marketed by Transphase. The gist of Transphase's complaint is that SCE and SDG & E have conspired with one another and independently used their monopoly power over the energy supply in .their respective service areas to hold down the rebate levels awarded to customers who utilize or desire to utilize DSM systems like that designed by Transphase. Plaintiffs allege that if the defendants had awarded consumers with the appropriate sized rebates, more customers would decide to buy TES systems and the value of Transphase's business would have increased by more than $50 million above its present value.

Transphase alleges two violations of Section 2 of the Sherman Act: Actual Monopolization (Comp. at ¶¶ 19–27) and Attempted Monopolization, including a conspiracy to attempt monopolization. In addition, Transphase also alleges a combination by SCE and SDG & E to restrain trade in violation of Section 1 of the Sherman Act. (Comp. at ¶¶ 40–43).

Transphase's actual monopolization claim alleges that the defendants enjoy monopoly power by "virtue of their ability to determine the prices of thermal energy storage systems and the electricity savings provided thereby to both the host customer and the DSM ratepayers." (Comp. at ¶ 20). Transphase contends that the defendants have willfully acquired and maintained their monopoly power over the "TES retrofit and DSM resources" by (1) "arbitrarily establish[ing]" rebates by refusing to consider new power plant costs when determining "avoided costs" and "manipulating" avoided costs; (2) controlling the amount of DSM funds to be budgeted for TES; and (3) controlling the "measuring and verifying" of whether the projected DSM savings are actually acquired. (Comp. at ¶¶ 20–22). In addition, the defendants are also accused of "actively resisting"

competitive bidding between DSM and supply side options and thus preventing Transphase from competing directly against proposals to build additional generating facilities. *Id.* .at ¶ 22.

.Transphase's Section 1 conspiracy claim alleges that the defendants have "conspired to restrain trade by establishing artificially low rebate levels for TES" and by establishing different measurement standards for themselves than those to be applied to independent DSM suppliers. In particular, Transphase alleges that the defendant utilities have "combined and conspired to restrain commerce among the various states by deliberately adjusting their avoided costs" and "appearing together before regulatory and other bodies" to oppose joint bidding between suppliers of supply-side management (SSM) and suppliers of DSM services like Transphase. (Comp. at ¶¶ 40–43.)

## II. DISCUSSION

### A. State Action Doctrine

■ Defendants contend that Transphase's antitrust claims are totally barred by the "state action" doctrine enunciated in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The state action doctrine places state sponsored restraints on competition beyond the reach of the Sherman Act in order to promote the principles of federalism and state sovereignty. *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 370, 111 S.Ct. 1344, 1349, 113 L.Ed.2d 382 (1991). The Supreme Court has set forth a two-pronged test for determining when actions taken by private parties, pursuant to a state regulatory regime, are immunized by the state action doctrine. First, the Court must determine whether the challenged restraint is "one clearly articulated and affirmatively expressed as state policy." *Southern Motor Carriers Rate Conf. v. U.S.,* 471 U.S. 48, 57, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1985) (quoting *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410,

---

2. Southern California Edison is one of the largest electric utilities in the United States and distributes and sells electricity to customers within a large segment of Los Angeles County and adjacent counties.

3. SDG & E is an electric utility based in San Diego which distributes and sells electricity within a large area of Southern California, including San Diego County and portions of Orange County.

98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)). Secondly, "the State must supervise actively any private anticompetitive conduct." *Southern Motor Carriers*, 471 U.S. at 57, 105 S.Ct. at 1727. (citing *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980)).[4] This supervision requirement is only satisfied "if state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *Patrick v. Burget*, 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988).

After a thorough analysis of the complaint, the parties' briefs and documentary exhibits, the relevant sections of the California Public Utilities Code, and the published opinions of the CPUC, the Court finds that both prongs of the *Midcal* test have been satisfied and, accordingly, holds that the defendants' allegedly anticompetitive actions are immunized by the state action doctrine.

Transphase's complaint alleges that defendants engaged in two basic anticompetitive acts: (1) failing to directly compare TES cost savings with the cost of supplying more electricity; and (2) suppressing both the total funds available for rebate subsidies and the rebate levels themselves. The CPUC decisions[5] cited by SCE and SDG & E clearly establish, however, that the form and extent of ratepayer funding for all DSM programs, including SCE's and SDG & E's, has been closely scrutinized, repeatedly modified, and ultimately approved by the CPUC.

**1. California Has a "Clearly Articulated and Affirmatively Expressed" Policy to Displace Competition with Respect to DSM Bidding and the Ratemaking Process**

The Court's review of the California Public Utilities Code reveals that the California legislature has clearly articulated and expressed its desire to displace competition with respect to DSM bidding and the ratesetting process. Section 747 of the Public Utilities Code sets up a legislatively mandated bidding system for demand side services and mandates that the CPUC should establish a pilot program of "competitive bidding auctions for demand side services." Other sections of the code, *see e.g.*, § 701.1(c), set forth the criteria for determining the proper rebate for DSM services and prohibit the CPUC from changing any rate or altering "any classification, contract, practice, or rule as to result in a new rate, except upon a showing before the Commission and a finding by the Commission that the new rate is justified." Cal.Pub.Util.Code § 454(a). Taken as a whole, the Public Utility Code clearly articulates the state's policy of displacing competition in favor of a highly regulated system of ratesetting and bidding on alternative DSM systems.

**2. The CPUC Has "Actively Supervised" SCE's and SDG & E's DSM Activities**

Transphase's complaint alleges that defendants SCE and SDG & E control almost

---

4. "This second prong of the *Midcal* test prevents the State from frustrating the national policy in favor of competition by casting a 'gauzy cloak of state involvement' over what is essentially private anticompetitive conduct." *Southern Motor Carriers*, 471 U.S. at 57, 105 S.Ct. at 1727 (citing *Midcal*, 445 U.S. at 106, 100 S.Ct. at 943).

5. Transphase objects to the defendants' submission of and citations to these reported CPUC decision and asserts that, if the Court decides to consider these decisions, defendants' motions would be transformed into motions for summary judgment, pursuant to Rule 56. The Court disagrees. The Court may take judicial notice of these decision under Federal Rule of Evidence 201(e) since their existence is a fact "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). The Ninth Circuit held in *Nugget Hydroelectric v. Pacific Gas and Electric*, 981 F.2d 429, 435 (9th Cir. 1992), that a district court could take published decisions of the CPUC into account on a motion to dismiss in order to determine whether the state had "actively supervised" a defendant's allegedly anticompetitive conduct. The *Nugget* court ultimately found that the CPUC decision at issue, together with the applicable Guidelines, were sufficient to prove that the state actively supervised the defendant's conduct, thus satisfying the second prong of the *Midcal* test.

The Court therefore finds that it may properly consider the reported decisions of the CPUC in the context of the defendants' motion to dismiss. Since the Court's consideration of these decisions does not transform this into a motion for summary judgment under Rule 56, the Court DENIES Transphase's request to submit evidence on the second, "active supervision" prong of the *Midcal* test.

every aspect of the DSM ratesetting and bidding processes in their respective geographic markets. Transphase alleges, for example, that the defendants (1) have the power to decide whether DSM vendors like Transphase should be permitted to bid directly against supply side alternatives that can generate their own electric power (Comp. at ¶ 20); (2) determine the amount of DSM funds to be budgeted for TES systems like Transphase's (Comp. at ¶ 20); and (3) decide the ways in which "electricity savings projected from DSM technologies are measured and verified." *Id.* Finally, Transphase alleges that the defendant utilities "choose to conduct" the rebate programs and that "ratepayers cannot negotiate directly with Transphase, which must deal with the ratepayers through the utilities." (Comp. at ¶ 15).

The reported decisions of the CPUC and the relevant sections of the California Utilities Code clearly establish that *all* of these allegations are false and unsupportable as a matter of law. In fact, the CPUC, not the defendant utilities, have the sole authority to (1) decide whether DSM vendors should be permitted to bid directly against supply side alternatives [6]; (2) establish the amount of DSM funds to be budgeted for TES systems [7]; and (3) decide the way in which electricity savings derived from DSM systems are measured and verified.[8] Moreover, the rebates provided to Transphase's customers are derived from ratepayer funds and cannot be collected or disbursed without the CPUC's explicit approval. Cal.Pub.Util.Code §§ 451, 454. Transphase's sweeping allegations about the control exercised by the defendants are thus totally unfounded. Rather, a careful review of the CPUC's published opinions clearly establishes that the Commission actively supervises every aspect of SCE and SDG & E's DSM activities attacked by Transphase's complaint.

For the preceding reasons, the Court finds that the anticompetitive actions alleged to have been committed by defendants SCE and SDG & E in Transphase's complaint are immunized from federal antitrust liability by the "state action" doctrine.

### B. *Defendants' Actions Are Immunized by the Noerr–Pennington Doctrine*

The defendants also assert that the "anticompetitive acts" which they are alleged to have committed in Transphase's complaint are protected by the *Noerr–Pennington* doctrine. The *Noerr–Pennington* doctrine protects the right of parties to petition the government even if the impact of their petition is likely to have an anti-competitive effect. *Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd.*, 542 F.2d 1076, 1080–81 (9th Cir.1976), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787, 542 F.2d at 1080 (1977) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition.")

As noted above, Transphase has alleged that the defendants violated Section 1 of the Sherman Act by (1) appearing together before the CPUC to take positions that would disadvantage Transphase; (2) filing joint briefs before the CPUC; and (3) speaking "in unison before [the CPUC] to demand the fruits of their monopolies." These actions are clearly protected by the *Noerr–Pennington* doctrine and therefore cannot form the basis for a conspiracy claim under Section 1.

Transphase's claims for monopolization and attempted monopolization under Section 2 of the Sherman Act are also protected by the *Noerr–Pennington* doctrine. Transphase alleges that the defendants have maintained their monopoly power by "resisting meaningful changes" to their rebate programs and resisting competitive bidding between DSM and supply side options. Although the complaint does not explicitly describe how defendants resisted these changes, it is clear from the context of the allegations, that the defendants' alleged resistance was exercised by the defendants

---

**6.** Indeed, the CPUC recently decided, after Transphase filed this complaint, to set up direct bidding between demand and supply side alternatives.

**7.** *See 1988 GRC* at 475–477; *1992 GRC* at 144.

**8.** *See Interim DSM Bidding Pilots* at 22.

through the public positions they took in the CPUC proceedings. Thus, Transphase's claims under section 2 of the Sherman act are also barred by the *Noerr–Pennington* doctrine.

Transphase alleges in its Opposition to both SCE and SDG & E's Motions that it is relying on the "sham" exception to the *Noerr–Pennington* doctrine, but Transphase has failed to plead anywhere in its complaint that the defendants' conduct before the CPUC was a "sham". Thus, Transphase's complaint must be dismissed. The Ninth Circuit has held that "a complaint must include allegations of the specific activities, not protected by *Noerr*, which plaintiffs contend have barred their access to a governmental body." *Franchise Realty, supra*, 542 F.2d at 1082. Transphase has failed to meet this demanding pleading standard.

■ Transphase asserts in its Opposition, however, that it should be provided an opportunity to amend its complaint to allege that the defendants' actions before the CPUC were a "sham". The "sham exception" does not appear to extend to direct lobbying efforts seeking action by an administrative body (like the CPUC), however. *Franchise Realty*, at 1080. Therefore, Transphase's request to amend its complaint by alleging that defendants' conduct was a "sham" would be futile.

The Court thus finds that Transphase's antitrust claims against the defendants are barred by the *Noerr–Pennington* doctrine.

### C. *Defendants SCE and SDG & E are Not Significant Competitors in the Relevant Product Market*

■ It is axiomatic in antitrust law that a defendant may not be found liable under the Sherman act for monopolizing or attempting or conspiring to monopolize a market unless that defendant is a competitor in the relevant market and his conduct creates a dangerous probability that he will gain a dominant share of the market. *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, ——– ——, 113

S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *Mercy–Penninsula Ambulance, Inc. v. County of San Mateo,* 791 F.2d 755, 759 (9th Cir.1986) (county government, which performed no health care services, could not be charged with having used its market power to exclude competition when it refused to license an ambulance service because it was not a competitor in the relevant product market). Defendant SDG & E contends that it cannot be found to have violated the Sherman Act because it is not a competitor in the relevant product market and Transphase's complaint neither alleges that SDG & E is a competitor in the relevant market nor that it's conduct creates a dangerous probability that it will monopolize that market.[9]

Transphase claims that the relevant product market "over which" the utilities exercise their monopoly power are "broadly speaking, DSM resources, and with specific respect to Transphase, retrofit thermal energy storage (TES) goods and services" like those supplied by plaintiff. (Comp. at ¶ 17). SDG & E asserts, however, that Transphase acknowledges in its complaint that SDG & E and SCE are not really competitors in this product market; they merely exercise control over the DSM goods and services provided by others by virtue of their alleged power to control the bidding programs and rebate levels for those services. The Court agrees with SDG & E's argument and therefore GRANTS its Motion to Dismiss on these grounds.

Transphase's complaint clearly states that while SDG & E and SCE "have a monopoly over the furnishing of [DSM systems and, specifically, Transphase's TES services] to the ratepayers ... [they] *are not themselves capable of supplying those goods and services to the ratepayers; only of preventing Transphase from so doing.*" (Comp. at ¶ 19) (emphasis added). In another paragraph, Transphase again alleges in a conclusory fashion that the defendants have monopolies over the provision of DSM services and have "willfully maintained" these monopolies;

**9.** Although SCE does not present this argument in its own motion to dismiss, the Court finds that this argument is applicable to SCE as well as SDG & E and thus dismisses Transphase's antitrust claims against SDG & E *and* SCE on the grounds presented in SDG & E's motion and Section C above.

Transphase concedes in the very next phrase, however, that the utilities "basically do nothing to supply such DSM resources to the ratepayers of California but hire others and charge large administrative costs and profits" to do so. (Comp. at ¶ 25). Transphase has also failed to allege that either SDG & E or SCE has significant market share in either the provision of DSM systems or in the TES systems marketed by Transphase.

Although the Court must assume that the allegations in a plaintiff's complaint are true when considering defendants' motion to dismiss, *N.L. Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986), the Court does not "need to accept as true conclusory allegations ... or unreasonable inferences." Schwarzer, Tashima, and Wagstaffe, *Federal Civil Procedure Before Trial*, § 9:221 at page 9–41. The Court thus rejects Transphase's conclusory allegations of the defendants' market power within the relevant *product* market (as opposed to geographic market) since these allegations are directly contradicted by Transphase's unambiguous admission that the utilities *"do nothing to supply such DSM resources to the ratepayers of California but hire others" to supply these systems.* (Comp. at ¶ 25) (emphasis added). Although Transphase alleges in its Opposition that "[c]urrently, SDG & E directly provides DSM resources to its ratepayers" and that Transphase "would never intimate that the defendant utilities are incapable of hiring someone to install" TES systems (Opposition at pages 14–15), the complaint itself clearly fails to allege either that (1) SDG & E or SCE competes with Transphase in the supply of DSM or TES systems; or (2) that the defendants' current activities create a dangerous probability that they will obtain a monopoly over, or even a dominant position, in the relevant product market. Transphase's complaint therefore fails to plead an actionable claim under the federal antitrust statutes.[10]

10. If there were no independent basis for dismissing Transphase's complaint, the Court would allow plaintiff leave to amend its complaint in the event that it could, in good faith, plead that the defendants are competitors in the *supply* or

### III. CONCLUSION

For the reasons discussed above, the Court GRANTS Defendants' Motions to Dismiss Transphase's federal antitrust claims. The Court also dismisses Transphase's pendent state law claims since all of plaintiff's federal claims have been dismissed. *See Les Shockley Racing, Inc. v. National Hot Rod Ass'n,* 884 F.2d 504, 509 (9th Cir.1989).

IT IS SO ORDERED.

*distribution* of DSM or TES systems. Given that the Court has also decided to dismiss Transphase's antitrust claims on two independent grounds, however, the Court does not grant Transphase leave to amend at this time.