Valdemar PORTNEY, an individual, Plaintiff and Counterclaim Defendant,

v.

CIBA VISION CORPORATION, a Delaware corporation, Defendant and Counterclaim Plaintiff.

Case No. SACV 07–0854 AG (MLGx).

United States District Court, C.D. California.

June 17, 2008.

Howard N. Wisnia (argued), James Pak and Tracey Angelopoulos of Baker & McKenzie, San Diego, CA, for Plaintiff, Dr. Valdemar Portney.

Patrick Kelleher (argued), Carrie Beyer of Drinker, Biddle and Reath, Chicago, IL, for Defendant/Counterclaimant, CIBA Vision Corp.

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO DISMISS CIBA'S COUNTERCLAIMS PURSUANT TO FRCP 12(b)(6) OR IN THE ALTERNATIVE TO BIFURCATE ANTITRUST COUNTERCLAIMS PURSUANT TO FRCP 42, AND MOTION TO STRIKE CIBA'S AFFIRMATIVE DEFENSES PURSUANT TO FRCP 12(f)

ANDREW J. GUILFORD, District Judge.

Before the Court is the Motion to Dismiss CIBA's Counterclaims Pursuant to FRCP 12(b)(6), or in the Alternative, to Bifurcate Antitrust Counterclaims Pursuant to FRCP 42, and Motion to Strike CIBA's Affirmative Defenses Pursuant to FRCP 12(f) ("Motion"), filed by Plaintiff and Counterclaim Defendant Valdemar Portney ("Plaintiff"). After considering the moving, opposing, and reply papers, and oral argument from the parties, the Court GRANTS in part and DENIES in part the Motion.

### BACKGROUND

Plaintiff filed this action in July 2007, alleging that Defendant and Counterclaim Plaintiff CIBA Vision ("Defendant") is liable for breaching a 1994 licensing agreement between the parties. Plaintiff contends that the parties entered into the licensing agreement to allow Defendant access to patents and other specialized technology related to multifocal contact lenses, and that in exchange Plaintiff was to receive royalties for any contact lenses sold using that knowledge and technology. (Complaint ¶¶ 58–71.) According to Plaintiff, Defendant has developed and sold "hundreds of millions of dollars of multifocal contact lenses using the licensed technology," but has refused to pay the negotiated royalties. (*Id.* at 1:18–23.)

In the Counterclaim, Defendant concedes that it entered into a licensing agreement with Plaintiff, but asserts that the technology and concepts under the agreement were not commercially viable and that it has never sold products using the licensed technology. The Counterclaim alleges nine claims for relief against Plaintiff, including patent invalidity, patent misuse, fraud, and attempted monopolization. In support of these claims for relief, Defendant alleges that Plaintiff initially procured the patents which were the subject of the licensing agreement through fraud on the patent office, and these patents should be found invalid and unenforceable. (Counterclaims ¶¶ 35–57; ¶¶ 88–110.) Defendant further alleges that Plaintiff knew his patents were unenforceable when entering into the licensing agreement with Defendant, but concealed that fact. (*Id.* at ¶¶ 124–125.) According to Defendant, Plaintiff's efforts to enforce his invalid patents in this and other lawsuits is an attempted monopolization which violates antitrust law. (*Id.* at ¶¶ 130–147.)

In this Motion, Plaintiff seeks dismissal of five of the nine counterclaims against him, and alternatively requests bifurcation of the antitrust claims. Plaintiff also requests that four of the affirmative defenses asserted by Defendant be stricken.

### LEGAL STANDARD

A complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Fed R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed R. Civ. P. 8(a)(2). "Ordinary pleading rules are not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). "Specific facts are not necessary; the statement

need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir.1993). Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment. *Jackson v. Carey*, 353 F.3d 750, 758 (9th Cir.2003) (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir.1996)); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir.2000); *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991).

## *ANALYSIS*

### 1. THIRD COUNTERCLAIM: PATENT MISUSE

Defendant's Third Counterclaim alleges that certain of Plaintiff's patents have been misused and are therefore unenforceable. The patent misuse alleged by Defendant involves Plaintiff's use of post-expiration royalties to "attempt[ ] to extend the life of the Portney patents beyond their statutory expiration dates." (Counterclaims ¶¶ 112–115.) Defendant also alleges unlawful efforts by Plaintiff to use the Portney patents for "monopolization of the multifocal contact lens market." (Counterclaims ¶ 116.)

■ "Patent misuse is an affirmative defense to an accusation of patent infringement, the successful assertion of which requires that the alleged infringer show that the patentee has impermissibly broadened the physical or temporal scope of the patent with anticompetitive effect." *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868, 869 (Fed.Cir.1997) (internal quotations and citations omitted). As an equitable defense, patent misuse renders the patent unenforceable until the misuse is purged. *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed.Cir.1998) (citing *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942)).

### 1.1 Post–Expiration Royalties and Patent Misuse

Defendant contends that the two licensing agreements covering the Portney patents—the AMO/Portney License and the AMO/CIBA Vision Sublicense—call for impermissible post-expiration patent royalties. Each of these licensing agreements provides that it will remain in effect for "the life of the Patent Rights in a country or 10 years from the date of the first sale of a Device in that country, whichever is longer." (Motion Ex. A.) According to Defendant, these agreements calls for post-expiration royalties because if Defendant "first sells a product covered by a patent claim 1 year before expiration of the Patent Rights, then patent royalty payments are due on that product for the 9 years following expiration." (Opposition 6:4-8.) Defendant's reading of the agreements, if correct, would state a claim of patent misuse. But Plaintiff contends that when the agreements are read in their entirety, Defendant's post-expiration royalty theory is not viable.

■ Plaintiff asserts that the "hybrid" nature of the agreements precludes an interpretation of the agreements which would require post-expiration royalties. A hybrid license distinguishes between royalties paid for the right to use the patents

themselves, and royalties paid to use trade secrets and technical knowledge ("Technical Information") not covered by a patent. When an agreement contemplates post-expiration royalties, the distinction between patent-right and Technical Information royalties is critical because "a contract that provides for royalties either when a patent expires or when it fails to issue cannot be upheld unless it provides a discount from the alternative, patent-protected rate." *Zila, Inc. v. Tinnell,* 502 F.3d 1014, 1021 (9th Cir.2007) (discussing interaction of the U.S. Supreme Court decisions of *Brulotte v. Thys,* 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99 (1964) and *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979)).

■ The parties dispute whether, upon expiration of the patent, the agreements call for continued payment of royalties at the higher patent rate. Plaintiff argues that no post-expiration patent royalties are contemplated because the agreements grant only the right to "to make, have made, use and sell Devices, which activity, but for this non-exclusive license, *would infringe the valid and enforceable claims of a patent* of the Patent Rights." (Motion Ex. A at pp. 7, 27 (emphasis added).) Plaintiff's position here is that because an expired patent can neither be infringed nor described as "valid and enforceable," the agreements do not provide for the payment of patent royalties on expired patents. (Motion 7:1–23.) Defendant contests this interpretation of the licensing agreements, asserting that (1) there is no explicit clause in the agreements providing for a post-expiration discount, and (2) Plaintiff has improperly conflated the concept of an expired patent with an invalid or unenforceable patent. (Opposition 6:23–7:27.) The Court disagrees with Defendant and finds that the agreements do not

contemplate post-expiration royalties at the higher patent rate.

■ Even without an explicit provision in the agreements calling for a discounted post-expiration royalty rate, the correct reading of the agreements precludes payment of post-expiration patent royalties. To avoid this result, Defendant attempts to distinguish expired patents from the "valid and enforceable claims" language of the agreements. (Opposition 7:4–27.) There are no doubt important differences between expired, invalid, and unenforceable patents. But these differences are not relevant to this dispute and are trumped by the primary purpose of the agreements, which is an exchange of royalty payments for the right to engage in activities that "but for the non-exclusive license, would infringe the valid and enforceable claims of a patent of the Patent Rights." (Motion Ex. A. at pp. 7, 27.) It is obvious that "[t]here can be no infringement after a patent has expired." *Atlas–Pacific Eng'g Co. v. Geo. W. Ashlock Co.,* 339 F.2d 288, 291 (9th Cir.1964). The agreements thus provide no grant of rights for use of patent-based knowledge, and require no reciprocal royalty, once the patent is expired and can no longer be infringed. Certainly, payment of the Technical Information royalties may continue after expiration of patents, because the Technical Information royalties were never premised on the status of a patent to begin with. The Technical Information royalties may remain in effect for the duration of the term of the licensing agreements—"the life of the Patent Rights in a country or 10 years from the date of the first sale of a Device in that country, whichever is longer"—even if the patents expire before the agreement does.

Defendant also argues that the continuation of patent royalties after expiration of a patent is evidenced by the fact that the agreements set up the Patent Rights

and Technical Information categories as "mutually exclusive", and "[o]ne cannot transform into the other." (Opposition 8:1–4.) Article 3.1 of the AMO/CIBA Vision Sublicense calls for royalty payments of 6% "on the Net Sales of Devices in the United States if covered by Patent Rights," and for royalty payments of 4% "on the Net Sales of Devices in the United States if not covered by Patent Rights." The Court agrees with Defendant that these two categories are mutually exclusive, as a device cannot simultaneously be "covered" and "not covered" by Patent Rights. But there is no reason that a device could not be "covered by Patent Rights" at one point in time, and "not covered" at a later time. A single device may incorporate various elements of design and technology, some falling under the Patent Rights category and others under the Technical Information category. When the patent expires, the licensee would no longer be required to pay the higher royalty rate for a device "covered by Patent Rights," but might still owe the lower rate for a device "not covered by Patent Rights," that is, a device that now contains only Technical Information elements. Contrary to Defendant's contention, this result does not require previously patented technology to be "transformed" into "Technical Information" upon expiration of the patent. (Opposition 8:4–16.) Instead, this result follows from the fact that Technical Information is independent from patented information, and expiration of patents thus has no bearing on the licensee's obligation to pay royalties for use of Technical Information.

In sum, while the licensing agreements themselves may survive the expiration of patents covered under those agreements, and thereby require the licensee's continued payment of Technical Information royalties, the ability to collect patent royalties is extinguished at the time of the patent's expiration. This is the correct reading of the agreements' grant of the right to engage in activity which, "but for" the agreement, "would infringe the valid and enforceable claims of a patent...." The Court's finding that the agreements do not require the post-expiration payment of patent royalties follows from the application of legal principles to the established terms of the relevant contractual provisions. The deficiencies of the Third Counterclaim could not, therefore, be cured by amendment, and it is DISMISSED WITHOUT LEAVE TO AMEND.

### 1.2 Attempted Monopolization and Patent Misuse

For the reasons stated in Section 2 of this Order, Defendant's claim of patent misuse based on attempted monopolization is DISMISSED WITH LEAVE TO AMEND.

### 2. SIXTH AND SEVENTH COUNTERCLAIMS: ANTITRUST VIOLATIONS

■ Defendant's Sixth and Seventh Counterclaims allege that Plaintiff's litigation of this matter, and of an earlier action against Johnson & Johnson, evidences an "attempt to monopolize" in violation of § 2 of the Sherman Act. 15 U.S.C. § 2. Besides pleading the necessary elements of an attempted monopolization claim, Defendant must also allege facts sufficient to establish that Plaintiff's legal actions are not immune from antitrust liability. But because the Court finds that Defendant's Counterclaim does not satisfy the necessary elements of an attempted monopolization claim under § 2, the Court does not address the immunity issue.

■ To state a claim for attempted monopolization under § 2 of the Sherman

Act, Defendant must allege the following required elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antitrust injury. *See Cost Mgmt. Servs. v. Washington Natural Gas Co.*, 99 F.3d 937, 949–50 (9th Cir.1996). "In order to survive a motion to dismiss under Rule 12(b)(6), an antitrust complaint "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." " *Id.* at 950 (quoting *Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir.1987)). The Court finds that the dispositive element in Defendant's antitrust claim is "dangerous probability of success." Because Defendant cannot establish this necessary element, the antitrust claim fails and there is no need to consider the other elements.

■ When considering whether a dangerous probability of successful monopolization exists, "courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). This can be understood as a two-part test looking to (1) the relevant market, and (2) the antitrust defendant's power in that market. *Newcal*, 513 F.3d at 1044. A "relevant market" is determined by a product market and a geographic market. *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 336, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). When considering the sufficiency of allegations related to the relevant market and power in the market, "[t]here is no requirement that these elements of the antitrust claim be pled with specificity," and an antitrust complaint will survive Rule 12(b)(6) scrutiny "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Newcal*, 513 F.3d at 1045. Despite this liberal standard, there are legal principles that govern the definition of an antitrust relevant market, "and a complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Id.* (citing *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436–37 (3d Cir.1997)).

## 2.1 Defining the Relevant Market

■ The first component of a relevant market is the product market. The product market is not defined by consumers, but by products or producers. *Newcal*, 513 F.3d at 1045 (citing *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502). A viable product market encompasses both the product at issue and all economic substitutes for the product: "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. 1502. While the general market contemplated must include all economic substitutes, "it is legally permissible to premise antitrust allegations on a submarket." *Newcal*, 513 F.3d at 1045. To establish a product submarket the antitrust plaintiff "must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market." (*Id.*)

Here, Defendant has alleged a "relevant product market or submarket" of "multifocal contact lenses." (Counterclaim ¶¶ 76–77.) According to Defendant, "[m]ultifocal contact lenses are prescribed for patients with presbyopia," and can "alleviate or lessen the effects of presbyobia by providing different focal lengths for objects that are near and objects that are far." (*Id.* at

¶ 76.) Defendant also states that "[m]ono-focal contact lenses do not provide these benefits and are not reasonably inter-changeable with multifocal contact lenses." (*Id.*) Plaintiff attacks Defendant's attempt to define a relevant product market as failing to "mention, let alone address, the rules of reasonable interchangeability and cross-elasticity." (Motion 11:20–21.) Plaintiff claims that Defendant's alleged product market does not consider the full range of potential economic substitutes for multifocal contact lenses, including bifocal glasses, Lasik surgery, or a combination of monofocal contact lenses with reading glasses. (*Id.* at 11:24–12:6.)

Plaintiff's critiques of Defendant's relevant product market fail at this motion to dismiss stage because they are factual critiques that do not show "that the alleged market suffers a fatal legal defect." *Newcal*, 513 F.3d at 1045. Without a factual showing, the Court is unable to determine whether the potential economic substitutes suggested by Plaintiff are reasonably interchangeable with multifocal contact lenses so that "customers may turn to them if there is an increase in the price of the main product." *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). "Since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Newcal*, 513 F.3d at 1045. And this is not the type of case where dismissal on the pleadings is appropriate, as such cases "frequently involve" either (1) failed attempts to limit product markets to a single brand, franchise, or institution, or (2) a failure even to attempt a plausible explanation as to why a market should be limited in a particular way. *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir.2001).

As for the geographic market, Defendant's Counterclaim contends that the because the sale of multifocal contact lenses inside the United States is regulated by the FDA, the geographic market for these "regulated products" is the United States. (Counterclaim ¶¶ 78–79.) Plaintiff opposes the United States as the relevant geographic market, arguing that because Defendant's international contact lens sales are twice its domestic sales, the relevant geographic market is international. (Motion 12:14–19.) But a geographic market is limited not only by the area in which the seller operates, but also by the area "to which the purchaser can practicably turn for supplies." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 359, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). It is at least arguable that a U.S. purchaser seeking multifocal contact lenses can only "turn for supplies" within the United States. Defendant's allegation of a geographic market limited to the United States is therefore sufficient at the pleading stage.

## 2.2 Power in the Relevant Market

Under § 2 of the Sherman Act, the conduct of a single firm or actor "is unlawful only when it threatens actual monopolization." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The parties vigorously dispute whether there is any legal basis for finding that Plaintiff, an individual who does not himself produce or sell contact lenses or otherwise compete in the contact lens market, threatens actual monopolization of a relevant market. Plaintiff argues that as "an individual without any manufacturing or sales capacity, [and] no market share whatsoever," he cannot possibly present a threat of monopolization. (Reply 10:2–7.) Defendant contends that Plaintiff's use of patents to exert control over prices in the

relevant market is sufficient to establish a dangerous probability of monopolization. (Opposition 15:7–26.)

The parties agree that "monopoly power" is the "power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). By defining the relevant market as "multifocal contact lenses," and citing an FTC report that identifies Johnson & Johnson and CIBA Vision as possessing a combined market share of nearly 100%, Defendant has implicitly conceded that Plaintiff is not a competitor and holds no market share in the relevant market. (Counterclaim ¶¶ 76–80.) However, Defendant asserts that the Counterclaim's allegations—that Plaintiff is seeking to exact royalties that will give him "control over price by driving up the costs of contact lens manufacturers"—satisfy the "power to control prices" component of monopoly power. (Opposition 15:7–20.) Plaintiff argues that an allegation of control over prices does not establish monopoly power unless the actor controlling prices is also a competitor in the relevant market. The Court agrees with Plaintiff.

In *Mercy–Peninsula Ambulance, Inc. v. County of San Mateo*, 791 F.2d 755 (9th Cir.1986), the Ninth Circuit addressed claims by an ambulance operator that the defendant county had violated § 2 of the Sherman Act by granting exclusive contracts to other providers for paramedic care within its boundaries. The primary issue in *Mercy–Peninsula* was whether the defendant was entitled to immunity on the basis of a state statute authorizing counties to restrict and limit provision of paramedic services to certain persons or organizations. *Mercy–Peninsula*, 791 F.2d at 757–58. But the court in *Mercy–Peninsula* also addressed plaintiff's claim that the defendant county violated § 2 of

the Sherman Act by issuing exclusive licenses before the state statute was enacted. *Id.* at 759. The court found no § 2 liability on this basis, stating that "[t]he gravamen of a section 2 claim is the deliberate use of market power by a competitor to control price or exclude competition." Thus, because "[t]he county perform[ed] no health care services" it was "not a competitor in the healthcare provision market and [could not] be charged with having used market position to exclude competition." *Id.* The requirement that a § 2 defendant be a "competitor" in the relevant market was reiterated in *Transphase Sys. v. Southern Cal. Edison Co.*, 839 F.Supp. 711, 717 (C.D.Cal.1993): "It is axiomatic in antitrust law that a defendant may not be found liable for monopolizing or attempting or conspiring to monopolize a market unless that defendant is a competitor in the relevant market and his conduct creates a dangerous probability that he will gain a dominant share of the market." 839 F.Supp. at 717.

In its Opposition, Defendant cites *Morton Grove v. Par Pharmaceutical*, 2006 WL 850873 (N.D.Ill.2006), as supporting its argument that an allegation of control over prices alone is sufficient to establish dangerous probability of monopolization. But in *Morton Grove* the antitrust defendant held a 75 percent market share, and was clearly a "competitor" in the relevant market. *Id.* at *9. Thus, the *Morton Grove* court was not required to consider whether allegations that a noncompetitor has exerted control over prices are sufficient to state a claim for liability under § 2.

At oral argument, Defendant for the first time cited two administrative law decisions to support its argument that an antitrust defendant need not be a "competitor" in the relevant market. The first case cited by Defendant in oral argument

was *In re Unocal,* 2004 WL 1632816 (F.T.C., July 6, 2004) (No. 9305), a proceeding before the Federal Trade Commission involving allegations that Union Oil Company of California fraudulently persuaded a department of the California Environmental Protection Agency to implement regulations that would require all refining facilities to use technology which Unocal possessed a proprietary interest in. *Unocal,* 2004 WL 1632816 at *6–*7. Defendant argues that because the facts of *Unocal* state that "[i]n March 1997, Unocal completed the sale of its west coast refining, marketing, and transportation assets," the FTC permitted allegations of attempted monopolization to proceed even though the defendant was not a "competitor." Defendant's characterization of *Unocal* is demonstrably wrong, as Defendant fails to mention that the anticompetitive conduct alleged against Unocal occurred between 1990 and 1995, well before Unocal's sale of its refinery operations. *Id.* at *3–*6. The defendant in *Unocal* was therefore a competitor in the relevant market when the allegedly anticompetitive acts occurred, and this case offers no support for Defendant's argument.

The second case raised by Defendant at oral argument was *In re Rambus, Inc.,* also an FTC proceeding. *In the Matter of Rambus, Inc.,* 2006 WL 2330117 (F.T.C. August 2, 2006) (No. 9302) (*rev'd, Rambus Inc. v. FTC,* 522 F.3d 456 (D.C.Cir.2008)). Similar to the decision in *Unocal,* in *Rambus* the FTC found that the defendant had improperly lobbied a standard-setting organization to adopt computer memory technology standards that would be covered by the defendant's patented technologies, without revealing its patent position to the organization. *Rambus,* 2006 WL 2330117 at *3. The parties in *Rambus* agreed on four relevant technology markets, and the Commission determined that defendant "held over 90 percent of the market share in the relevant markets," and therefore "possessed monopoly power in the … markets alleged." *Id.* at *72–73. *Rambus* is therefore inapposite to this case, where Defendant's Counterclaim defines the relevant market as one in which Plaintiff is not a competitor and possesses no market share.

The Court finds no legal authority for Defendant's attempt to establish that there is a "dangerous probability" that Plaintiff will successfully monopolize the market. Considering the arguments and concessions made by Defendant, it seems unlikely that this defect is curable. But because dismissal without leave to amend is improper unless it is clear "that the complaint could not be saved by any amendment," *Polich,* 942 F.2d at 1472, Defendant's Sixth and Seventh Counterclaims for antitrust violations are DISMISSED WITH LEAVE TO AMEND.

### 3. EIGHTH COUNTERCLAIM: UNFAIR COMPETITION

Defendant's Eighth Counterclaim alleges violation of California Business and Professions Code § 17200. (Counterclaim ¶¶ 149–150.) Section 17200 prohibits unfair competition, which is defined as "any unlawful, unfair, or fraudulent business act or practice." "By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999).

Defendant claims violations of § 17200 stemming from Plaintiff's alleged antitrust violations and fraud. Regarding the antitrust claim, this fails for the same reasons Defendant's allegations of a violation of

§ 2 of the Sherman Act fail. Regarding the fraud claim, this is not challenged by Plaintiff and survives the motion to dismiss.

### 4. NINTH COUNTERCLAIM: DIS-GORGEMENT OF ROYALTIES

Defendant's Ninth Counterclaim seeks disgorgement of royalties paid to Plaintiff by Allergan Medical Optics ("AMO"), who also entered into a licensing agreement with Plaintiff but is not a party to this litigation. (Counterclaim ¶¶ 151–155.) Plaintiff seeks dismissal of this claim, arguing that Defendant has no standing to seek disgorgement on behalf of AMO. The Court agrees with Plaintiff.

"The Article III doctrine that requires a litigant to have 'standing' to invoke the power of a federal court" is an essential limitation on federal judicial power in our system of government. *Allen v. Wright,* 468 U.S. 737, 750–51, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). At the core of the standing doctrine is the requirement that plaintiff allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* at 751, 104 S.Ct. 3315. This "injury in fact" test is not satisfied by an injury to some cognizable interest, but requires that the plaintiff be among the injured. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562–63, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citing *Sierra Club v. Morton,* 405 U.S. 727, 734–3, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).

 Defendant argues that it has standing to seek relief on behalf of AMO because the licensing agreement on which Plaintiff is suing Defendant is a sublicense of the agreement between Plaintiff and AMO, and thus if the agreement between Plaintiff and AMO is undone, "so too is the sublicense and the supposed contractual rights on which [Plaintiff] sues." (Opposi-

tion 22:19–23:6.) Defendant cites *Newcal Industries v. IKON Office Solution,* 513 F.3d 1038 (9th Cir.2008), where the plaintiff sought a declaratory judgment that the defendant's contracts with various third parties were void and unenforceable. 513 F.3d at 1056. The district court dismissed the claim for lack of standing, but the Ninth Circuit reversed. The Ninth Circuit found that because the defendant had threatened to sue the plaintiff for interfering with contractual relationships, the plaintiff "had a stake in the controversy even though it was not a party to the relevant contracts". *Id.* Defendant in this action contends that, like the plaintiff in *Newcal,* it is entitled to assert standing on behalf of a third party because it "has a stake in the controversy."

In their present condition, the pleadings do not adequately allege that Defendant has a stake in the resolution of a dispute between Plaintiff and AMO sufficient to confer standing. Unlike the plaintiff in *Newcal,* Defendant does not allege that it has been threatened with litigation specifically related to Plaintiff's relationship with AMO. *Newcal,* 513 F.3d at 1056 (holding that under certain circumstances "the threat of suit is enough to create standing"). AMO's potential claims against Plaintiff may be similar to those raised in Defendant's counterclaims, but resolution of the potential third party claims is not necessary to "clarify and settle the legal relations in issue" between Plaintiff and Defendant. *Id.* at 1057. In other words, Defendant has not shown that it will suffer any injury, either in its ability to defend itself in this case or its ability to fend off future litigation, if the claims between AMO and Plaintiff are not addressed in this action. Defendant's Ninth Counterclaim is therefore DISMISSED WITH LEAVE TO AMEND.

## 5. REQUEST TO STRIKE FOUR OF DEFENDANT'S AFFIRMATIVE DEFENSES

 Plaintiff seeks to strike four of Defendant's affirmative defenses under Federal Rule of Civil Procedure 12(f). Rule 12(f) permits a court to strike from a pleading any redundant, immaterial, impertinent, or scandalous matter. Courts must view the pleadings under attack in the light most favorable to the pleader. *Lazar v. Trans Union LLC*, 195 F.R.D. 665, 669 (C.D.Cal.2000). Motions to strike "are generally not granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of litigation." *LeDuc v. Kentucky Cent. Life Ins. Co.*, 814 F.Supp. 820, 830 (N.D.Cal.1992).

### 5.1 Affirmative Defense 4: Patent Misuse

For the reasons discussed in Section 1.1 of this Order, Defendant's affirmative defense of patent misuse is not supported by law and is therefore STRICKEN.

### 5.2 Affirmative Defenses 6, 8, and 9: Estoppel, Waiver, and Unclean Hands

Plaintiff requests that the defenses of estoppel, waiver, and unclean hands be stricken from Defendant's pleadings. Plaintiff contends that the defenses should be stricken because Defendant has not pled any facts to support the defenses, but has merely asserted that "[d]iscovery may demonstrate evidence" to support them. (Motion 21:18–22:2.) Defendant concedes the absence of facts supporting the defenses, and states that its goal was to provide Plaintiff with notice that these issues may arise in the litigation. Accordingly, affirmative defenses 6, 8, and 9 are STRICKEN, but this is done without prejudice to Defendant reasserting these defenses with supporting facts in the future.

### DISPOSITION

Plaintiff's Motion is GRANTED IN PART and DENIED IN PART: Defendant's Third Counterclaim is DISMISSED WITHOUT LEAVE TO AMEND regarding patent royalties, and DISMISSED WITH LEAVE TO AMEND regarding the alleged antitrust violation; Defendant's Sixth and Seventh Counterclaims are DISMISSED WITH LEAVE TO AMEND; Defendant's Eighth Counterclaim is DISMISSED WITH LEAVE TO AMEND to the extent it alleges antitrust violations; Defendant's Ninth Counterclaim is DISMISSED WITH LEAVE TO AMEND for lack of standing; Defendant's affirmative defense of patent misuse is STRICKEN; Defendant's affirmative defenses of estoppel, waiver, and unclean hands are STRICKEN WITHOUT PREJUDICE.

Where the Court has granted leave to amend, Defendant may file an amended counterclaim within 21 days of this Order, setting forth adequate allegations against Plaintiff. The amended counterclaim shall be complete in and of itself, and shall not incorporate by reference any prior pleading.

IT IS SO ORDERED.